# EXHIBIT A

EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK, STATE OF COLORADO, ex rel. PHILIP J. WEISER, ATTORNEY GENERAL, STATE OF DELAWARE ex rel. KATHLEEN JENNINGS, ATTORNEY GENERAL,STATE OF DELAWARE, THE PEOPLE OF THE STATE OF ILLINOIS, through ATTORNEY GENERAL KWAME RAOUL, THE STATE OF MINNESOTA, by its ATTORNEY GENERAL, KEITH ELLISON, THE STATE OF NORTH CAROLINA , ex rel. Joshua H. Stein, Attorney General, and THE STATE OF WISCONSIN, <br><br>Plaintiffs, <br><br>v. <br><br>STRATFS, LLC (f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC), STRATEGIC CLIENT SUPPORT, LLC (f/k/a PIONEER CLIENT SERVICES, LLC), STRATEGIC CS, LLC, STRATEGIC FS BUFFALO, LLC, STRATEGIC NYC, LLC, BCF CAPITAL, LLC, T FIN, LLC, STRATEGIC CONSULTING, LLC, VERSARA LENDING, LLC, STRATEGIC FAMILY, INC., ANCHOR CLIENT SERVICES, LLC (NOW KNOWN AS CS 1 PAAS SERVICES, LLC), BEDROCK CLIENT SERVICES, LLC, BOULDER CLIENT SERVICES, LLC, CANYON CLIENT SERVICES, LLC, CAROLINA CLIENT SERVICES, LLC, GREAT LAKES CLIENT SERVICES, LLC, GUIDESTONE CLIENT SERVICES, LLC, HARBOR CLIENT | **CASE NO.** <br><br><br><br> **COMPLAINT FOR INJUNCTIVE RELIEF, RESTITUTION, AND CIVIL MONEY PENALTIES** |

SERVICES, LLC, HEARTLAND CLIENT
SERVICES, LLC, MONARCH CLIENT
SERVICES, LLC (NOW KNOWN AS CS 2
PAAS SERVICES, LLC), NEWPORT CLIENT
SERVICES, LLC, NORTHSTAR CLIENT
SERVICES, LLC, OPTION 1 CLIENT
SERVICES, LLC, PIONEER CLIENT
SERVICING, LLC, ROCKWELL CLIENT
SERVICES, LLC, ROYAL CLIENT SERVICES,
LLC, STONEPOINT CLIENT SERVICES,
LLC, SUMMIT CLIENT SERVICES, LLC
(NOW KNOWN AS CS 3 PAAS SERVICES,
LLC), WHITESTONE CLIENT SERVICES,
LLC, RYAN SASSON, JASON BLUST, and
UNIDENTIFIED JOHN DOES 1-50,

Defendants, and

DANIEL BLUMKIN, ALBERT IAN BEHAR,
STRATEGIC ESOP, STRATEGIC ESOT,
TWIST FINANCIAL, LLC, DUKE
ENTERPRISES, LLC, BLAISE
INVESTMENTS, LLC, THE BLUST FAMILY
IRREVOCABLE TRUST THROUGH
DONALD J. HOLMGREN, TRUSTEE,
JACLYN BLUST, LIT DEF STRATEGIES,
LLC, and RELIALIT, LLC,

Relief Defendants.

## Introduction

1.      The Consumer Financial Protection Bureau (Bureau) and the State of New

York, the State of Colorado, the State of Delaware, Attorney General, the People of the

State of Illinois, the State of Minnesota, the State of North Carolina, and the State of

Wisconsin (collectively, the States) file this Complaint against StratFS, LLC (f/k/a

Strategic Financial Solutions, LLC), Strategic Client Support, LLC (f/k/a Pioneer Client

Support, LLC), Strategic CS, LLC, Strategic FS Buffalo, LLC, Strategic NYC, LLC, BCF

Capital, LLC, T Fin, LLC, Strategic Consulting, LLC, Versara Lending, LLC, Strategic

Family, Inc. (collectively, SFS), Anchor Client Services, LLC (now known as CS 1 PAAS Services, LLC), Bedrock Client Services, LLC, Boulder Client Services, LLC, Canyon Client Services, LLC, Carolina Client Services, LLC, Great Lakes Client Services, LLC, Guidestone Client Services, LLC, Harbor Client Services, LLC, Heartland Client Services, LLC, Monarch Client Services, LLC (not known as CS 2 PAAS Services, LLC), Newport Client Services, LLC, Northstar Client Services, LLC, Option 1 Client Services, LLC, Pioneer Client Servicing, LLC, Rockwell Client Services, LLC, Royal Client Services, LLC, Stonepoint Client Services, LLC, Summit Client Services, LLC (now known as CS 3 PAAS Services, LLC), Whitestone Client Services, LLC (collectively, Client Services Subsidiaries), Ryan Sasson, Jason Blust (collectively, Individual Defendants), and Unidentified John Does 1-50, which are additional SFS companies and Client Services Subsidiaries that are currently unknown.

2.      The Bureau and the States (collectively Plaintiffs) file this Complaint against Daniel Blumkin, Albert Ian Behar, Strategic ESOP, Strategic ESOT, Twist Financial, LLC, Duke Enterprises, LLC, Blaise Investments, LLC, the Blust Family Irrevocable Trust Through Donald J. Holmgren, Trustee, Jaclyn Blust, Lit Def Strategies, LLC, and Relialit, LLC as Relief Defendants.

3.      The Bureau brings this action under the Telemarketing and Consumer Fraud and Abuse Prevention Act (Telemarketing Act), 15 U.S.C. §§ 6102(c), 6105(d); the Telemarketing Sales Rule (TSR), 16 C.F.R. pt. 310; and Sections 1031, 1036(a), 1054, and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5536(a), 5564, 5565, in connection with the marketing and sale of debt-relief services.

4.      The State of New York, by its Attorney General (NYAG), is authorized to take action to enjoin repeated and persistent fraudulent and illegal conduct under New

York Executive Law § 63(12) and deceptive business acts and practices under New York General Business Law ("GBL") Article 22-A.

5.    Pursuant to the Telemarketing Act, 15 U.S.C. §§ 6103(a) and (f)(2), the NYAG is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, to enforce compliance with the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of New York residents, or to obtain such further and other relief as the court may deem appropriate. The NYAG is also authorized to enforce the CFPA. 12 U.S.C. § 5552(a).

6.    Pursuant to the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), the State of Colorado, by its Attorney General, is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, to enforce compliance with the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Colorado residents, or to obtain such further and other relief as the court may deem appropriate. The State of Colorado is also authorized to enforce the CFPA. 12 U.S.C. § 5552(a).

7.    Pursuant to the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), Kathleen Jennings, Attorney General of Delaware, is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, to enforce compliance with the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Delaware residents, or to obtain such further and other relief as the court may deem appropriate. The State of Delaware is also authorized to enforce the CFPA. 12 U.S.C. § 5552(a).

8.    Pursuant to the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), the State of Illinois, by its Attorney General Kwame Raoul, is authorized to initiate federal

district court proceedings to enjoin telemarketing activities that violate the TSR, to enforce compliance with the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Illinois residents, or to obtain such further and other relief as the court may deem appropriate. The State of Illinois is also authorized to enforce the CFPA. 12 U.S.C. § 5552(a).

9.      Pursuant to the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), the State of Minnesota, by its Attorney General, is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, to enforce compliance with the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Minnesota residents, or to obtain such further and other relief as the court may deem appropriate. The State of Minnesota is also authorized to enforce the CFPA. 12 U.S.C. § 5552(a).

10.     Pursuant to the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), the State of North Carolina, by its Attorney General, is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, to enforce compliance with the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of North Carolina residents, or to obtain such further and other relief as the court may deem appropriate. The State of North Carolina is also authorized to enforce the CFPA. 12 U.S.C. § 5552(a).

11.     The State of Wisconsin, by its Attorney General and Department of Justice (WIAG), is authorized under Wis. Stat. §§ 165.25(1m), 220.04(10), and 220.12 to take action to enforce compliance with the State's adjustment service company law, Wis. Stat. § 218.02, and the administrative rule promulgated thereunder, Wis. Admin. Code § DFI-Bkg. Ch. 73, and to seek a permanent or temporary injunction or restraining

5

order, appointment of a receiver, and order for recission of any acts determined to be unlawful.

12.     Pursuant to the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), the WIAG is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, to enforce compliance with the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Wisconsin residents, or to obtain such further and other relief as the court may deem appropriate. The WIAG is also authorized to enforce the CFPA. 12 U.S.C. § 5552(a).

**Overview**

13.     Since at least January 2016, Defendants have operated a debt-relief scheme that collects exorbitant, illegal advance fees from vulnerable consumers suffering financial difficulties. SFS employs third parties to solicit consumers who have large debts, frequently suggesting that these consumers may qualify for a loan to assist with debt relief. When the consumers call the company listed on the mailer or webpage, the phone rings at SFS, and SFS employees answer the calls. These employees generally advise the consumers that they do not qualify for the loan. Instead, they encourage the consumers to enroll in SFS's debt-relief service by promising that Defendants' network of lawyers will negotiate reduced payoff amounts with consumers' creditors and defend consumers in the event of a creditor lawsuit.

14.     Immediately after consumers enroll in the program, Defendants begin collecting substantial fees from them, despite admitting to consumers that any settlements with creditors will take months to secure. Defendants' front-loaded fees leave the consumers with little money for any such potential settlements. As a result, consumers regularly pay into the debt-relief service for months before Defendants reach

6

a settlement with even one creditor, and Defendants collect a significant amount of fees in the interim. Some consumers exit the program having paid substantial fees, but with none of their debts settled or reduced. Many consumers end up with more debt than they started with, see their credit scores decrease substantially, and end up getting sued by creditors. Already-vulnerable consumers often end up in a worse financial situation than before, while Defendants profit. Since at least January 2016, Defendants have collected over $84,000,000 in unlawful fees from consumers through these schemes.

15.     The Individual Defendants, Ryan Sasson and Jason Blust, conduct this operation using a web of interrelated companies they have created. Individual Defendant Sasson created SFS and its Client Services Subsidiaries, which operate as a common enterprise. Individual Defendants Sasson and Blust also created façade law firms (the "Façade Firms") that correspond to each Client Services Subsidiary. These law firms serve as a façade for SFS's debt-relief operation and perform little to no work on behalf of consumers. The Individual Defendants also created shell companies and consulting firms that funnel money to the Individual Defendants.

### Jurisdiction

16.     This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

17.     This Court has supplemental jurisdiction over the States' state law claims because they are so related to the federal claims that they form part of the same case or controversy. 28 U.S.C. § 1367(a).

### Venue

7

18.     Venue is proper in this district because SFS is located, resides, and does business here and because a substantial part of the events or omissions giving rise to the claims occurred in this district. 12 U.S.C. § 5564(f); 28 U.S.C. § 1391(b)(2).

### The Parties

19.     The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products or services under Federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority, 12 U.S.C. § 5564(a)-(b), including the authority to enforce the TSR as it applies to persons subject to the CFPA, 15 U.S.C. §§ 6102(c)(2), 6105(d).

20.     Letitia James, Attorney General of New York, is authorized to bring this action on behalf of the State of New York and its citizens to enforce New York Law, the TSR, and the CFPA.

21.     Philip J. Weiser, Attorney General for Colorado, is authorized to bring this action on behalf of the State of Colorado and its citizens to enforce the TSR and CFPA.

22.     Kathleen Jennings, Attorney General of Delaware, is authorized to bring this action on behalf of the State of Delaware and its citizens to enforce the TSR and CFPA.

23.     Kwame Raoul, Illinois Attorney General is authorized to bring this action on behalf of the People of the State of Illinois to enforce the TSR and CFPA.

24.     Keith Ellison, Attorney General of Minnesota, is authorized to bring this action on behalf of the State of Minnesota and its citizens to enforce the TSR and CFPA.

25.     Joshua H. Stein, Attorney General of the State of North Carolina, is authorized to bring this action on behalf of the State of North Carolina and its citizens to enforce the TSR, and the CFPA.

8

26.     Joshua L. Kaul, Attorney General of Wisconsin, is authorized to bring this action on behalf of the State of Wisconsin to enforce Wisconsin law, the TSR, and the CFPA.

*SFS*

27.     Strategic Family, Inc. is the parent company of other SFS defendants, including StratFS, LLC (f/k/a Strategic Financial Solutions, LLC), Strategic Client Support, LLC (f/k/a Pioneer Client Services, LLC), Strategic CS, LLC, Strategic FS Buffalo, LLC, Strategic NYC, LLC, BCF Capital, LLC, T Fin, LLC, Versara Lending, LLC, and Strategic Consulting, LLC (collectively, SFS, as defined above).

28.     SFS maintains its principal place of business at 115 Lawrence Bell Drive, Buffalo, NY 14221. SFS's website (stratfs.com) says that its main office is located at this address. SFS offers and provides "financial advisory services," including debt-relief services, to consumers owing unsecured debts to creditors. These services are offered to consumers primarily for personal, family, or household purposes.

29.     In connection with a campaign to induce consumers to purchase its services, SFS initiates and receives interstate telephone calls to and from consumers. During these calls, SFS offers to renegotiate, settle, or alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors. Thus, SFS is a "telemarketer" offering "debt-relief services" under the TSR. 16 C.F.R. § 310.2(o), (ff).

30.     SFS provides, offers to provide, or arranges for others to provide debt-relief services to consumers in exchange for consideration. Thus, SFS is also a "seller" offering "debt-relief services" under the TSR. 16 C.F.R. § 310.2(o), (dd).

*Non-Party Façade Firms*

9

31.     On paper, SFS partners with purported law firms around the country, and the firms offer and promise to provide services, including debt-relief services, to consumers owing unsecured debts to creditors. Each firm is paired with an SFS-owned Client Services Subsidiary that usually has a name similar to the firm, and non-attorney negotiators from SFS and its Client Services Subsidiaries are the ones tasked with renegotiating a consumer's debt – if such negotiations happen at all. Because most or all of the services are carried out by non-attorneys who are not employees of the firm, the firms are referred to herein as "Façade Firms" and are not named as defendants herein.

32.     Many of the Façade Firms appear not to have physical offices, and instead utilize virtual offices and mailboxes, like UPS Store-rented mailboxes. For at least some of the Façade Firms, incoming mail is scanned by a third party and then uploaded not to the law firm but rather to SFS.

33.     The Façade Firms work on behalf of SFS to offer debt-relief services to consumers owing unsecured debts to creditors. The Façade Firms are therefore "covered persons" under the CFPA. 12 U.S.C. § 5481(6), (19).

34.     In connection with SFS's telemarketing transactions, the Façade Firms offer to provide or arrange for others to provide debt-relief services to consumers in exchange for consideration. Thus, the Façade Firms are "sellers" offering "debt-relief services" under the TSR. 16 C.F.R. § 310.2(o), (dd).

35.     The Façade Firms include but are not limited to:

- A. Florio & Associates, PLLC d/b/a Bedrock Legal Group f/k/a Raggio & Associates, PLLC;

- Anchor Law Firm, PLLC;

- Boulder Legal Group, LLC;

- The Brian A Moore Law Firm LLC d/b/a Guidestone Law Group;

- Burnette Legal Group, LLC d/b/a Monarch Legal Group;

- Daniel Rufty Legal PLLC d/b/a Carolina Legal Services;

- Donald Norris Associates PLLC d/b/a Stonepoint Legal Group;

- Gardner Legal LLC d/b/a Option 1 Legal;

- Great Lakes Law Firm, LLC;

- Greene Legal Services, LLC d/b/a Newport Legal Group;

- Harbor Legal Group, LLC;

- Henry Legal Group, PLLC d/b/a Heartland Legal Group;

- Hodyno & Associates, PLLC d/b/a Rockwell Legal Group;

- JMS Industries, LLC d/b/a Canyon Legal Group;

- Pioneer Law Firm, P.C., f/k/a John B. Dougherty P.C.;

- Northstar Legal Group, LLC;

- Royal Legal Group, LLC;

- The Sands Law Group, LLP d/b/a Whitestone Legal Group; and

- WyoLaw, LLC d/b/a Summit Law Firm.

*Client Services Subsidiaries*

36.    The SFS-owned Client Services Subsidiaries perform services to facilitate the scheme. Each SFS-owned Client Services Subsidiary corresponds to one or more Façade Firms, and most of the Client Services Subsidiaries share a name with a Façade Firm. For example, Anchor Client Services, LLC corresponds to Anchor Law Firm, PLLC. SFS uses the Client Services Subsidiaries to siphon money from consumers'

accounts and profits from the Façade Firms and to mask SFS's involvement in the debt-relief operation.

37.   The Client Services Subsidiaries work on behalf of SFS and the Façade Firms to offer debt-relief services to consumers who owe unsecured debts to creditors. These services are offered to consumers primarily for personal, family, or household purposes.

38.   In connection with SFS's telemarketing transactions, the Client Services Subsidiaries offer to provide or arrange for others to provide debt-relief services to consumers in exchange for consideration. Thus, the Client Services Subsidiaries are "sellers" offering "debt-relief services" under the TSR. 16 C.F.R. § 310.2(o), (dd).

39.   Because the Client Services Subsidiaries are in a common enterprise with SFS, they are liable for SFS's actions under the TSR. *See infra* ¶¶ 41-50.

40.   The Client Services Subsidiaries involved in the common enterprise include:

- Anchor Client Services, LLC (now known as CS 1 PAAS Services, LLC);

- Bedrock Client Services, LLC;

- Boulder Client Services, LLC;

- Canyon Client Services, LLC;

- Carolina Client Services, LLC;

- Great Lakes Client Services, LLC;

- Guidestone Client Services, LLC;

- Harbor Client Services, LLC;

- Heartland Client Services, LLC;

- Monarch Client Services, LLC (now known as CS 2 PAAS Services, LLC);

- Newport Client Services, LLC;

- Northstar Client Services, LLC;

- Option 1 Client Services, LLC;

- Pioneer Client Services, LLC;

- Rockwell Client Services, LLC;

- Royal Client Services, LLC;

- Stonepoint Client Services, LLC;

- Summit Client Services, LLC (now known as CS 3 PAAS Services, LLC); and

- Whitestone Client Services, LLC.

*Common Enterprise*

41.     SFS and its Client Services Subsidiaries operate as a common enterprise controlled by Individual Defendant Sasson. Sasson has common control of all these entities. SFS and its Client Services Subsidiaries share addresses at 711 3rd Ave, 6th Floor, New York, NY 10017. The Client Services Subsidiaries do not have distinct spaces within that address.

42.     The same people control the bank accounts for SFS and its Client Services Subsidiaries. For example, account-opening documents from Valley Bank show that Individual Defendant Sasson, SFS's CEO, opened accounts for Strategic Client Support, LLC, Atlas Client Services, LLC (related to a company that may be another façade firm), Strategic Financial Solutions, LLC, Strategic LD, LLC (another company likely owned by SFS), Versara Lending, Strategic CS, LLC, and Anchor Client Services, LLC. Sasson opened an account for Strategic Client Support, LLC.

13

43.     Similarly, Ryan Sasson was the signer for the bank accounts of nineteen Defendants at Key Bank. Sasson was the signer for Strategic Financial Solutions, LLC, Anchor Client Services, LLC, BCF Capital, LLC, Bedrock Client Services, LLC, Boulder Client Services, LLC, Canyon Client Services, LLC, Carolina Client Services, LLC, Great Lakes Client Services, LLC, Harbor Client Services, LLC, Pioneer Client Servicing, LLC, Rockwell Client Services, LLC, Royal Client Services, LLC, Stonepoint Client Services, LLC, Strategic Client Support, LLC, Strategic Consulting, LLC, Strategic CS, LLC, Strategic FS Buffalo, LLC , Strategic NYC, LLC, and Summit Client Services, LLC.

44.     SFS and its Client Services Subsidiaries commingle funds. For example, records for bank accounts held by three Client Services Subsidiaries show that they each transferred millions of dollars to various companies in the common enterprise, including Strategic Client Support, LLC, Strategic NYC, LLC, Strategic CS, LLC, and Strategic Consulting, LLC. The following chart shows the transfers into and out of an account held by Strategic NYC, LLC between October 2017 and December 2020. This SFS entity received money from multiple Client Services Subsidiaries and distributed that money throughout the common enterprise.

14

| Account 7645 - STRATEGIC NYC, LLC | | | |
|---|---|---|---|
| **Account / Activity** | **Account Name** | **Incoming** | **Outbound** |
| 3931 | BEDROCK CLIENT SERVICES, LLC | 20,961,075.22 | - |
| 7076 | BOULDER CLIENT SERVICES LLC | 17,787,737.97 | - |
| WIRE IN | | 17,584,963.27 | - |
| 9379 | ANCHOR CLIENT SERVICES LLC | 13,353,426.79 | - |
| 2687 | ROCKWELL CLIENT SERVICES, LLC | 10,532,106.15 | - |
| 3847 | TIMBERLINE FINANCIAL, LLC | 8,711,564.85 | - |
| 5085 | HARBOR CLIENT SERVICES, LLC | 4,499,204.86 | - |
| 9557 | PIONEER CLIENT SERVICING, LLC | 3,114,446.29 | - |
| 5128 | STONEPOINT CLIENT SERVICES, LLC | 1,128,877.69 | - |
| 7649 | CANYON CLIENT SERVICES, LLC | 843,238.61 | - |
| 8385 | ROYAL CLIENT SERVICES, LLC | 786,341.94 | - |
| 1538 | CELL GRAMERCY OF CONTEGO INSURANCE LLC | 400,000.00 | - |
| 7514 | BCF CAPITAL, LLC | 39,402.70 | - |
| 3206 | ATLAS DEBT RELIEF, LLC | 4,378.34 | - |
| 3458 | ATLAS CLIENT SERVICES LLC | 4,300.00 | - |
| 1294 | VERSARA LENDING LLC | - | 34,251,717.68 |
| 7922 | STRATEGIC CS, LLC | - | 17,736,230.06 |
| 9204 | STRATEGIC CONSULTING, LLC | - | 16,962,610.30 |
| 1894 | STRATEGIC FINANCIAL SOLUTIONS, LLC | - | 13,010,883.31 |
| 1286 | STRATEGIC CLIENT SUPPORT LLC | - | 12,978,297.03 |
| 5354 | PEERFORM INC. | - | 2,398,698.15 |
| 9490 | STRATEGIC FS BUFFALO, LLC | - | 952,219.15 |
| 3204 | STRATEGIC LD, LLC | - | 723,384.53 |
| WIRE OUT | | - | 701,262.47 |
| 5847 | F SOLUTIONS LLC | - | 24,257.72 |
| 5269 | STRATEGIC FAMILY, INC. | - | 10,250.00 |
| **Grand Total** | | 99,751,064.69 | 99,749,810.40 |

45.   In addition, records from another bank show that Anchor Client Services, LLC, Bedrock Client Services, LLC, Boulder Client Services, LLC, Canyon Client Services, LLC, Carolina Client Services, LLC, Harbor Client Services, LLC, Heartland Client Services, LLC, Monarch Client Services, LLC, Northstar Client Services, LLC, Option 1 Client Services, LLC, Pioneer Client Servicing, LLC, Rockwell Client Services, LLC, Royal Client Services, LLC, Stonepoint Client Services, LLC, and Whitestone Client

Services, LLC, at least, sent millions of dollars to T Fin, LLC and Strategic NYC, LLC between approximately 2018 and 2021.

46.     SFS and its Client Services Subsidiaries share a phone system. The phone system has a common set of extensions across SFS and its Client Services Subsidiaries such that employees of the common enterprise can call each other without dialing outside of the system.

47.     In December 2018, SFS contracted with a data analytics firm to analyze the common enterprise's phone calls for sales and retention purposes. As part of this process, SFS sent recorded phone calls to the data analytics firm. The calls included those from phone lines named Anchor Creditor Line, Bedrock Creditor Line, Boulder Creditor Line, Canyon Creditor Line, Carolina Creditor Line, Great Lakes Creditor Line, Harbor Creditor Line, Pioneer Creditor Line, Rockwell Creditor Line, Royal Creditor Line, Stonepoint Creditor Line, and Summit Creditor Line. SFS also shared call recordings from a phone line named "Generic CS Creditor Line," which exemplifies the internal interchangeability of the Client Services Subsidiaries.

48.     SFS and its Client Services Subsidiaries also share employees. Although individual employees' salaries may be paid by SFS or a Client Services Subsidiary, such employees perform work for all of the Client Services Subsidiaries. In some instances, the same employees answer phone lines associated with multiple Client Services Subsidiaries. For example, one employee whose salary was paid by SFS answered consumer calls to multiple phone lines associated with Client Services Subsidiaries, including the Boulder Creditor Line, the Harbor Creditor Line, the Rockwell Creditor Line, the Royal Creditor Line, and the Summit Creditor Line.

49.     Similarly, when consumers enrolled in the debt-relief service try to call the law firm they believe is representing them, the call is routed to SFS where SFS employees answer the phone using the name of the Client Services Subsidiary or Façade Firm associated with each consumer. The entity name under which an SFS employee answers a consumer phone call can change with each call. Thus, a single SFS employee will answer dozens of consumer calls in any given day, representing themselves as an employee of numerous different Client Services Subsidiaries or Façade Firms. One employee who answers calls from consumers holds himself out to be a representative of at least six different Façade Firms, although his salary is paid by Strategic Client Support, LLC.

50.     SFS and its Client Services Subsidiaries also share leadership. Consumers who attempt to call the Façade Firm they believe represents them reach customer service representatives who are often paid by SFS. Ryan Sasson has represented that these customer service representatives work for SFS's Client Services Subsidiaries. The customer service representatives report to the Senior Director of Client Services and Senior Director of Customer Services. Both of these Senior Directors report to the Vice President of Client Service Operations who directly reports to SFS CEO Ryan Sasson.

*Individual Defendants*

51.     Ryan Sasson is one of the founders and the current Chief Executive Officer of SFS. He is listed as an officer of SFS on corporate tax filings.

52.     Sasson is a former employee of Legal Helpers Debt Resolution, LLC ("Legal Helpers"), a debt-relief firm that was sued and eventually shut down as a result of actions by the Attorneys General of Illinois, Wisconsin, North Carolina, and West Virginia. The Attorneys General alleged that Legal Helpers charged unlawful up-front

fees, failed to reduce consumers' debts as promised, and attempted to avoid advance-fee

bans by recruiting attorneys to act as fronts for the business. Compl., *Illinois v. Legal*

*Helpers Debt Resol., LLC*, No. 2011 CH 00286 (Sangamon Cty., Ill. Mar. 2, 2011);

Compl., *Wisconsin v. Legal Helpers Debt Resol., LLC*, No. 2013 CX 11 (Dane Cty., Wis.

June 12, 2013); Compl., *North Carolina v. Legal Helpers Debt Resol., LLC*, No.

14CV006409 (Wake Cty., N.C. May 15, 2014); Compl., *West Virginia v. Legal Helpers*

*Debt Resol., LLC*, No. 13-C-2330 (Kanawha Cty., W. Va. Dec. 20, 2013). The Illinois and

North Carolina Attorneys General actions resulted in consent judgments enjoining Legal

Helpers from engaging in debt relief in their respective states. Judgment, *Illinois v.*

*Legal Helpers Debt Resol., LLC*, No. 2011 CH 00286 (Sangamon Cty., Ill. July 2, 2012);

Judgment, *North Carolina v. Legal Helpers Debt Resol., LLC*, No. 14CV006409 (Wake

Cty., N.C. Sept. 29, 2014). The North Carolina consent judgment also enjoined the

principals of the firm from engaging in debt relief and entered judgments in the

amounts of $1,533,000 and $122,000 against Legal Helpers and the individual

defendants, respectively. *Id.* The Wisconsin Attorney General's action and the West

Virginia Attorney General's action resulted in judgments for $12,272,000 and $135,000,

respectively, and settlement agreements enjoining Legal Helpers and the principals of

the firm from engaging in debt relief in Wisconsin and West Virginia. Judgment,

*Wisconsin v. Legal Helpers Debt Resol., LLC*, No. 2013 CX 11 (Dane Cty., Wis. Feb. 15,

2016); Settlement Agreement, *Wisconsin v. Legal Helpers Debt Resol., LLC*, No. 2013

CX 11 (Dane Cty., Wis. May 13, 2016); Judgment, *West Virginia v. Legal Helpers Debt*

*Resol., LLC,* No. 13-C-2330 (Kanawha Cty., W.Va. June 2, 2014). Sasson knows or

should know, based on these matters, that it is illegal to charge up-front fees for debt-

relief services and that using third parties to act as fronts for the entities benefitting from the illegal fees does not relieve him from liability.

53.   At all times material to this Complaint, acting alone or in concert with others, Sasson has exercised substantial control over and involvement in the establishment of SFS's business policies and practices described in this Complaint. At all times material to this Complaint, Sasson has exercised managerial responsibility for SFS and has materially participated in the conduct of its affairs.

54.   Jason Blust created, maintains, and controls multiple Façade Firms designed to conceal SFS's involvement in the debt-relief service. He controls the Façade Firms and directs consumer funds to himself through a series of consulting companies, including Relief Defendants Relialit and Lit Def Strategies. Jason Blust resides in Lake Barrington, Illinois. He entered into a stipulated judgment with the United States Bankruptcy Trustee for the District of Kansas regarding numerous violations of bankruptcy law arising from the scheme alleged in this complaint. Judgment, *U.S. Trustee Lashinsky v. Blust,* No. 18-06046, Doc #17 (Bankr. D. Kan. 2018). Jason Blust knows or should know that the conduct alleged herein is illegal. He is also a former attorney at Legal Helpers. Jason Blust knows or should know, based on the Legal Helpers matters discussed in Paragraph 52, that it is illegal to charge up-front fees for debt-relief services and that using third parties to act as fronts for the entities benefitting from the illegal fees does not relieve him from liability.

55.   At all times material to this Complaint, acting alone or in concert with others, Jason Blust has exercised substantial control over and involvement in the establishment of the Façade Firms' business policies and practices described in this Complaint. Jason Blust recruited attorneys to help run, or serve as figureheads for, the

Façade Firms, including at least one SFS employee who simultaneously serves as a member of multiple Façade Firms while working for SFS. At all times material to this Complaint, Jason Blust has exercised managerial responsibility for the Façade Firms and has materially participated in the conduct of their affairs, in part through his consulting firms Relialit and Lit Def Strategies. He also acts as a liaison between the Façade Firms and SFS.

### Relief Defendants

56.    Relief Defendant Strategic Employee Stock Ownership Trust (Strategic ESOT) holds all the shares of SFS stock. In May 2017, Strategic Financial Solutions, LLC adopted the Strategic Employee Stock Ownership Plan (Strategic ESOP) and became the ESOP's sponsor. SFS companies reorganized in December 2017 and Strategic Family, Inc. became the parent company In December 2017, the Strategic ESOP purchased all the shares of Strategic Family, Inc.'s common stock funded by the Strategic ESOT, thus becoming wholly employee owned. The Strategic ESOT may maintain funds held in trust, while the ESOP determines how the ESOT is administered, who participates in it, and who runs the day-to-day operations.

57.    Relief Defendant Daniel Blumkin is one of the founders and the current Chief Sales Officer of SFS. Blumkin and Sasson were the two initial members of Encore Capital USA, LLC in 2010; in 2015, Sasson changed the name to Strategic Financial Solutions, LLC. Blumkin is listed as an officer of SFS on corporate tax filings. Blumkin

resides in Port Washington, New York. He is a former Vice President of Sales with Legal Helpers.

58.     Relief Defendant Albert Ian Behar is one of the founders of SFS. Behar resides in Miami Beach, Florida and New York, New York.

59.     Relief Defendant Twist Financial, LLC is a corporation controlled by Daniel Blumkin. Blumkin and Twist share an address at 1 Greenwood Ln, Port Washington, NY 11050. Twist and SFS share an address at 711 3rd Avenue, 6th Fl., New York, NY 10017. Defendants use Twist to funnel consumer funds from the Façade Firms, the Client Services Subsidiaries, and SFS to Daniel Blumkin. Twist Financial was also a partial owner of Legal Helpers.

60.     Relief Defendant Duke Enterprises, LLC is a corporation controlled by Ryan Sasson. Defendants use this corporation to funnel consumer funds from the Façade Firms, the Client Services Subsidiaries, and SFS to Ryan Sasson.

61.     Relief Defendant Blaise Investments, LLC is a corporation controlled by Albert Ian Behar. Defendants use this corporation to funnel consumer funds from the Façade Firms, the Client Services Subsidiaries, and SFS to Albert Ian Behar.

62.     Relief Defendant the Blust Family Irrevocable Trust is controlled by Donald J. Holmgren, Trustee. Jason Blust funnels consumer funds from the Façade Firms, the Client Services Subsidiaries, and SFS into the Blust Family Irrevocable Trust via Lit Def Strategies, LLC.

63.     Jason Blust funnels consumer funds from the Façade Firms, the Client Services Subsidiaries, and SFS to Relief Defendant Jaclyn Blust via Lit Def Strategies, LLC and the Blust Family Irrevocable Trust.

64.     Relief Defendants Lit Def Strategies, LLC and Relialit, LLC are corporations controlled by Jason Blust. He uses these corporations to funnel consumer funds from the Façade Firms, the Client Services Subsidiaries, and SFS to himself.

### Overview of Defendants' Debt-Relief Services Scheme

65.     Since at least January 2016, SFS has marketed and sold debt-relief services to consumers.

66.     Through at least late 2022, SFS marketed its debt-relief services via the U.S. Mail, the Internet, and outbound or inbound telephone calls to or from consumers, including via interstate phone calls. One way that SFS attracted financially-distressed consumers is through mail solicitations suggesting that the consumers have been pre-approved for a debt-consolidation loan or may be eligible for such a loan. These solicitations encouraged the consumer to "apply" and provided a phone number to call for more information.

67.     When a consumer called the number provided on the solicitation, an SFS employee who was not an attorney answered the phone and gathered additional information from the consumer. In the end, the consumer who was trying to apply for a loan was typically told that they did not qualify for the debt-consolidation loan, and an SFS representative tried to convince the consumer to enroll in the debt-relief service instead.

68.     If the consumer agreed to enroll in the debt-relief service, then SFS connected the consumer with a Façade Firm.

69.     Generally, once a consumer agreed to sign up for the debt-relief service, SFS or a Façade Firm arranged for the consumer to meet with a third-party notary, who was not an employee of SFS, a Client Services Subsidiary, or a Façade Firm. The notary

has typically been paid a nominal fee simply to get the documents signed, has limited knowledge about the contents of the documents being signed, and cannot answer any questions about their content. Some notaries are paid more for the meeting if the documents are fully signed.

70.    Once a consumer signed the enrollment documents, an attorney from the assigned Façade Firm contacted the consumer and read a short script welcoming the consumer to the program. This rote "attorney welcome call" was often the only time the consumer spoke to an attorney in connection with the SFS debt relief program.

71.    Upon enrollment, SFS representatives instructed consumers to stop paying debts they enrolled in the program. The SFS representatives also told some consumers that creditors were more likely to settle debts when their accounts were delinquent.

72.    SFS representatives also instructed consumers not to speak with their creditors if the creditors contacted the consumers, and SFS sometimes gave consumers a script to follow during calls with creditors.

73.    Upon enrolling in the program, consumers were required to immediately begin making monthly payments into an escrow account managed by either RAM or Global, two payment processors with which SFS or the Façade Firms have contracted.

74.    Representatives of SFS or the Client Services Subsidiaries told consumers that once they have saved enough money in those escrow accounts, the money would be used to settle the consumers' debts for less than they owe.

75.    Some consumers reported that when they started to complain about the fact that their debts were not being settled or their creditors were not being paid, SFS or

23

the Client Services Subsidiaries instructed them that they could pay even more into their escrow accounts so that the debts could be resolved.

76.    When consumers tried to call their designated Façade Firm after they enrolled in the program, their calls were typically routed to SFS representatives who were not attorneys but who held themselves out as representatives of the Façade Firm the consumer believed was representing them. In reality, these representatives were employed by SFS-controlled entities, including the Client Services Subsidiaries. These representatives are primarily located in a call center in Buffalo, NY or New York, NY.

77.    During the enrollment process, SFS representatives often told consumers that enrollment in the program included litigation defense services and that a lawyer would represent them in any lawsuit related to non-payment of enrolled debts. Similarly, the retainer agreements consumers signed with Façade Firms promised that the firm lawyers would provide litigation defense if the consumer was sued by creditors while participating in the debt-relief service. But each contract also contained a loophole provision allowing the Façade Firm to avoid participating in the litigation if the assigned lawyer determined that the consumer is not likely to gain a favorable result. Indeed, consumers reported that Façade Firm lawyers almost never represented them when they were sued by creditors even after the consumers paid the retainer fee.

### Notary Meetings as Part of the Enrollment Process

78.    As noted in Paragraph 69 above, as part of the enrollment process the Façade Firms contracted with third party notary-provision companies, including Sunshine Signing Connection, Inc., NotaryGO, and National Paralegal & Notary (collectively Notary Companies), to send independent contractor notaries to obtain signatures on the enrollment paperwork and the retainer agreement.

79.     The contracts required the notaries to schedule appointments with the consumers and to oversee the execution of documents, including "getting all appropriate signatures from the client."

80.     The notaries scheduled these meetings at locations convenient for the consumer, including coffee shops and restaurants. The meetings did not all occur in person, however. In particular, during the COVID-19 pandemic, many of these notary meetings took place through Zoom or over the phone without any in-person meeting at all.

81.     The notary meetings were typically brief and non-substantive. For instance, one consumer described the notary process as a "flyby presentation" and said that the notary, who made clear he could not explain things because he was just a notary and not an employee, seemed "like a robot going through a script."

82.     SFS executives have acknowledged that the notary meetings are cursory and non-substantive. According to a Senior Vice President of Sales at SFS:

> [A]ll we do is just get these people to just kind of pencil whip and sign [the contract] . . . . It doesn't seem like it's as meaty as we make it sound. . . I didn't realize we don't give 'em a copy of the contract when they sign.

In the same conversation, a Senior Director of Negotiations replied:

> I agree with you, it's almost like you're pencil-whipped into signing that day because since you already came all the way here, you know just let's get through this – and I think they just made it more fluffy you know as far as the um presentation, if you will, and they sign the presentation – so I mean it's almost like a CYA on our end.

83.     The contracts between the Façade Firms and the Notary Companies did not require the individual notaries to have any substantive knowledge of the product or the company or to be able to meaningfully interact with consumers on behalf of the company about the product. While the contracts required the notaries to give an "in-

person presentation," they did not require the notary to have any understanding of the presentation or to even read it beforehand.

84.     The contracts between Façade Firms and the Notary Companies also did not require the individual notaries to answer consumers' questions about the product or the company. In practice, if a consumer had a question or concerns while signing the contract, the Notary Companies or the individual notaries called SFS by phone so that the consumer could direct their question or concerns to someone from SFS.

85.     Consumers also reported that when they asked the notaries substantive questions, the notaries often advised the consumer to direct their questions to the sales representative (an employee of SFS or the Client Services Subsidiary) with whom the consumer previously spoke or referred the consumer to the documents they were signing.

86.     The meetings between these third-party contractors and consumers were brief and perfunctory and did not provide the consumers with direct or substantive interaction with the seller of the product the consumer was purchasing; the only direct or substantive interaction consumers could have with anyone from SFS before they signed the contract was by phone.

### Fees Defendants Charge Consumers

87.     The documents that consumers signed often included information about the fees the consumers would be charged and advised that such fees would begin at the outset of the arrangement. For instance, one example provided by a consumer included fees such as a "retainer fee," "a service cost," "a legal admin fee," and "a banking fee."

88.     Consistent with Defendants' direction, RAM and Global: (i) withdrew

funds from a consumer's bank account through ACH transfer and deposited them into

the consumer's escrow account; and (ii) transmitted funds for processing and servicing

fees from the consumer's escrow account to themselves, the Client Services Subsidiaries,

the Façade Firms, and sometimes SFS.

89.     Immediately after a consumer enrolled in the programs, fees were

deducted from their escrow accounts with RAM or Global before SFS, Client Services

Subsidiaries, or Façade Firms settle any debts. These fees included retainer fees, service

fees, and legal administrative fees.

90.     The fees Defendants charged consumers as part of this debt-relief service

were substantial. A sample of payment data from RAM for approximately 34,000

consumers enrolled in SFS's program over an approximately five-year period shows that

these consumers collectively paid over $100,000,000 in fees to Defendants and the

Façade Firms (including retainer fees, legal admin fees, and service fees) before any

debt-relief payments were made to creditors. This figure does not include fees collected

from Global. As explained below, a large portion of the fees collected through RAM and

Global was ultimately funneled to SFS or the Individual Defendants.

91.     During the period of time covered by the sample, no one working on behalf

of SFS (including representatives for the Client Services Subsidiaries and Façade Firms)

settled any debt for approximately one-third of consumers who paid into the program.

92.     Furthermore, the service fee that Defendants charge for the program was

often based solely on a percentage of the consumer's enrolled debt; the fee was not

based on the individual debt settlements that the program achieves. In particular, when

the consumer had multiple debts that were eventually settled one at a time, the service

fee was not proportional to the amount of debt actually settled or based on a fixed percentage of the amount saved. Likewise, the retainer fee, administrative fees, and other fees were not based on individual debt amounts or the debt settlements that the program achieved.

93.     Charging consumers these high fees and withdrawing them from their accounts on the front-end, before settling any of their debts, hindered Defendants' ability to settle consumers' debts at all. For instance, some consumer contracts advised that individuals often needed to accumulate approximately 25% of the "then-current balance of a debt" in their account (e.g., $2,500 for a $10,000 debt) before a good-faith offer could be made to settle a debt with a creditor. But it was difficult for a consumer to accumulate a balance that high in their escrow account when SFS, the Client Services Subsidiaries, and the Façade Firms were withdrawing large fees from it each month, leaving only a small amount to fund potential settlements.

94.     According to account statements for one consumer who enrolled in the debt-relief service, E.S., she paid approximately $2,114 into her account before the first payment was made to a creditor. Prior to this payment being made, approximately 91% of the funds the consumer paid into her account (roughly $1,900) were withdrawn as fees. During the entire period this consumer was enrolled in the debt-relief service, approximately 84% of the funds she paid into her account were deducted as fees and only 16% of the funds were paid to creditors.

95.     Similarly, another consumer, P.G., paid approximately $7,452 into her account before the first payment was made to a creditor. Before that payment was made, roughly 68% of the funds the consumer paid into her account had been deducted to cover fees. During the entire period the consumer was enrolled in the debt-relief service,

roughly 64% of the funds she paid into her account were deducted as fees and only 6.5% of the funds were paid to creditors. The remainder was refunded after the attorney that she believed had been representing her, Daniel Rufty, was suspended by the North Carolina State Bar.

### Allocation of Fees Among Defendants

96.    Despite the labels associated with each fee charged to consumers enrolled in the debt-relief service, the money was not always distributed consistent with its described purpose. For example, records from RAM show that at times, the Client Services Subsidiaries—which purportedly did not provide legal services—received legal retainer fees, in addition to service fees and legal administrative fees.

97.    Similarly, records from RAM show that the Façade Firms received not just legal retainer fees, but also sometimes received service fees and legal administrative fees.

98.    The lack of concern about which entities received which fees demonstrates the interrelatedness of SFS, the Client Services Subsidiaries, and the Façade Firms.

99.    An analysis of bank records further demonstrated that SFS and its Client Services Subsidiaries operated as a common enterprise.

100.   Although the Façade Firms typically signed the contracts with RAM and Global, RAM and Global directly paid the Client Services Subsidiaries substantial amounts of money. For example, from September 2016 to July 2018, bank records showed that Global paid Boulder Client Services approximately $46,000,000 and paid Anchor Client Services approximately $21,000,000. Similarly, from February 2017 to July 2018, RAM paid Bedrock Client Services approximately $30,000,000.

101.    Bank records show that shortly after receiving money from RAM and Global, the Client Services Subsidiaries transferred nearly all of the money to SFS. For example, between October 2016 and August 2018, Boulder Client Services transferred approximately $46,000,000—the same amount it received from Global—to various SFS accounts, including accounts held by Strategic Client Support, LLC, Strategic Financial Solutions, LLC, Strategic NYC, Inc., Strategic CS, LLC, and Strategic Consulting, LLC. Similarly, between November 2016 and August 2018, Anchor Client Services transferred approximately $20,000,000—around 95% of what it received from Global— to various SFS accounts, and between February 2017 and August 2018, Bedrock Client Services transferred approximately $29,000,000—around 96% of what it received from RAM— to various SFS accounts.

102.    RAM records show that Defendant Versara Lending, LLC, ostensibly a lender, received fees from debt-relief consumers. Records from Valley Bank show that, from October 2016 through August 2022, Versara Lending, LLC received over $177 million in incoming wires and net transfers from various SFS entities. Records from Valley Bank also show that Versara Lending, LLC wired over $85 million to Versara DNLFA, LLC, which may be another name for Versara Lending, LLC.

### SFS's Model Evolves Over Time

103.    Consumer complaints, bank records, and website records suggest that SFS currently operates through additional companies, many of which purport to be law firms.

104.    Based on Defendants' practice of regularly changing company names or establishing new entities, Plaintiffs believe that there are additional Client Services Subsidiaries and Façade Firms that Plaintiffs have yet to identify. For example, Sasson

30

was involved in the creation or maintenance of websites for Atlas Debt Relief LLC,
Hallock & Associates, Law Office of Melissa Michel LLC d/b/a Spring Legal, and Moore
Legal Group, LLC d/b/a Meadowbrook Legal Group, at least. And consumer complaints
suggest that Atlas Debt Relief LLC, Brandon Ellis Law Firm, Dakis Legal Group LLC
d/b/a/ Clear Creek Legal, Derek Williams Law Firm, LLC f/k/a Infinite Law Group,
Hallock & Associates, Law Office of Melissa Michel LLC d/b/a Spring Legal, Moore
Legal Group, LLC d/b/a Meadowbrook Legal Group, and Michel Law, LLC d/b/a Level
One Law are affiliated with SFS.

105.   Bank records show that Blust is a member of Credit Advocates Law Firm,
and that company paid SFS and Lighthouse Tax & Financial LLC (owned by Blust).

106.   Bank records also show that Law Offices of Amber Florio, LLC d/b/a The
Commonwealth Law Group, PLLC received money from the following Façade Firms:

- Florio & Associates, PLLC, d/b/a Bedrock Legal Group, f/k/a Raggio &
  Associates, PLLC;

- Boulder Legal Group, LLC;

- Greene Legal Services, LLC d/b/a Newport Legal Group;

- Harbor Legal Group, LLC;

- Hodyno & Associates, PLLC d/b/a Rockwell Legal Group;

- JMS Industries, LLC d/b/a Canyon Legal Group;

- Royal Legal Group, LLC;

- The Sands Law Group d/b/a Whitestone Legal Group; and

- Wyolaw d/b/a Summit Law Firm.

107.    In addition, the following companies are affiliated with Blust or made payments to Relialit or Lit Def:

- Chinn Legal Group d/b/a Slate Legal Group;

- Colonial Law Group;

- Crimson Legal Group, LLC d/b/a Fontana Law Group, LLC;

- Dubin Legal Group d/b/a Ascend Legal Group;

- Frontier Consumer Law Group a/k/a Leigh and Laruwe Law Firm;

- The Law Office 554;

- Law Office of Melissa Michel LLC d/b/a Spring Legal;

- Law Offices of Arne Skatrud & Associates d/b/a Cornerstone Legal Group LLC;

- Law Offices of Brandon S Chabner d/b/a Golden Law LLP;

- Lori Leigh & Associates d/b/a Phoenix Legal;

- Strong Law Group PLLC;

- Turnbull Law Group, LLC f/k/a Turnbull & Associates; and

- Watson Law d/b/a Corporate Legal Network.

### Consumer harm

108.    Regardless of how SFS changes its corporate form, consumers continue to be harmed. For example, consumer C.E. was still paying fees to the common enterprise in September 2023. After being enrolled in the common enterprise's debt relief program for nearly four years and paying around $26,000 in fees, he still owed approximately $18,000 to four creditors that he had enrolled in the debt-relief program.

109.    Many consumers enrolled in SFS's debt-relief service received zero or little benefit in the form of settled debts and, instead, ended up owing creditors more money than when they started.

110.    The data sample from RAM referenced above in Paragraph 90 indicates that, on average, consumers participated in the program for eight months before Defendants settled any of their debts. It also suggests that Defendants do not settle *any* debts for many consumers enrolled in their program.

111.    In addition, when consumers stopped paying their debts (as directed by Defendants), creditors often added interest and fees to their accounts and were likely to, and did in fact, sue them for nonpayment. If the creditors obtained judgments, they could garnish consumers' wages. Consumers' credit scores often plummeted.

112.    Many consumers were understandably concerned about the potential adverse impact of stopping payment on their credit cards. When consumers asked direct questions about these issues SFS's salespersons routinely told consumers that they were very unlikely to be sued and that their credit scores would only suffer a small reduction, that the reduction would be temporary, and that their score would increase substantially once their debts were settled through the program.  These representations were misleading and deceptive.

113.    Defendants also routinely describe their programs as having a "zero percent" interest rate, since the amount of their payments were fixed at the time of enrollment. These representations were misleading and deceptive because Defendants were not offering consumers enrolled in in their debt-relief program a loan and many creditors did in fact add interest and fees once consumers stopped paying. Many

consumers ended up exiting Defendants' debt relief program owing creditors more than when they began the program.

114.    When attempting to enroll consumers in the SFS debt-relief program, salespersons often made misleading, deceptive, and fraudulent statements to encourage consumers to enroll. Defendants were aware of hardball sales tactics and encouraged such behavior. SFS paid bonuses to sales representatives that successfully sold their debt relief scheme, which resulted in substantial fees to Defendants, while promptly terminating those that failed to do so.

115.    Consumers often learned from creditors that neither Defendants nor the Façade Firms ever contacted them. Unaware that this could occur, consumers often stopped communicating with their creditors based on Defendants' instruction. For example, one consumer, K.L., enrolled in the debt-relief service in October 2019. After a default judgment was entered against the consumer with regard to one debt in June 2021, the consumer reached out to two other creditors with whom Defendants were supposed to be negotiating. The consumer learned from these creditors that nothing had been paid on these debts since she enrolled in the debt-relief service twenty months prior and no one from any of the Defendants or the Façade Firms had contacted the creditors.

116.    Consumers were led to believe that they had an attorney and law firm to represent them should their creditors sue, but many consumers received no such representation, despite having paid significant retainer and legal fees. These representations by Defendants were misleading and deceptive.

117.    Even when consumers withdrew early from the program, the amount of money in their escrow account had been substantially drained by fees, regardless of whether any enrolled debts have been settled.

118.    For example, one consumer, S.M., was in the program for approximately four years, during which his Global account statements show he made net payments into his escrow account of approximately $19,841 and only one debt was settled in the amount of approximately $8,524. Yet when the consumer withdrew from SFS's program, his escrow account contained only $666. The remaining $10,651 had been deducted from his account to cover fees.

119.    A Senior Director of Client Services acknowledged this problem in a call with a Senior Director of Customer Service:

> I gave him [VP of Client Service Operations] the scenario I've given him 1200 times, which is[:] a client's been in the program four months, wants to cancel. Can't save, [consumer]I want my money back. [SFS rep] Here's your $20. [consumer] Where is the other $900 I gave you? [SFS rep]Oh, sorry, that was service fees.' [consumer] Well I want it back. What do they [SFS reps] do? What do they do? Do we give them the authority to refund the $900 or is it going to Tier 2? So he's like well no, I think it needs to go to Tier 2.

The Senior Director of Client Services went on to explain that Tier 2 was not adequately staffed to handle the volume of calls in which consumers request refunds: "[a]lmost every single call, people want refunds."

120.    SFS designed its program to extract more fees from consumers early in the debt-relief program. SFS worked to keep consumers in the program while SFS was collecting fees, but, as fees declined later in the program, SFS often would not invest resources in attempting to settle the consumers' debts. A Vice President of Client Service

Operations described the situation: "I know this sounds terrible, but if [a consumer] just wants to pay us and then leave to save us money, then OK."

121.    Consumer complaints suggest that SFS, working through the Façade Firms, continues to collect fees (a) before resolving any debt for consumers; (b) that do not bear the same proportional relationship to the total fee as the individual debt amount bears to the entire debt amount at the time of enrollment; and (c) that are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. In 2023 alone, there are approximately 127 consumer complaints in the FTC's Sentinel database involving the Façade Firms. These consumers are being harmed by Defendants' ongoing unlawful conduct.

122.    For example, one consumer, R.O., complained that he was charged nearly $10,000 in advance fees between July 2020 and June 2023, and none of his debts were settled. All of those fees were prohibited by the TSR.

123.    Since January 2016, SFS and the Façade Firms have taken at least $100,000,000 in fees from consumers before any of the consumers' debts were renegotiated, settled, reduced, or otherwise altered.

### The Façade Firms Are Controlled by Ryan Sasson and Jason Blust and Act as Cover for SFS

124.    Individual Defendants Ryan Sasson and Jason Blust created the Façade Firms to provide consumers with the sense that SFS's debt-relief service is professional and trustworthy, and to conceal the role of SFS from consumers and the public.

125.    SFS and Sasson benefit from the concealment of SFS as the primary actor in the debt-relief service. When consumers complain to regulators, prosecutors, or the Better Business Bureau, they complain about the Façade Firm (whose name they have),

36

not SFS (whose name they do not have). This shields SFS from scrutiny and could make it more difficult for consumers to bring lawsuits against the SFS operation.

126.    Despite Defendants' efforts to present Façade Firms as separate from SFS, Ryan Sasson and Jason Blust maintain and control the Façade Firms as part of their debt-relief scheme.

### Sasson's Role in the Façade Firms

127.    As the CEO of SFS, Ryan Sasson coordinates with Jason Blust and other Façade Firm attorneys to conceal SFS's role in providing debt-relief services. Sasson created and controls the Client Services Subsidiaries that correspond to each Façade Firm.

128.    Sasson also created and owns Façade Firm websites, including websites for Northstar Legal Group, Atlas Law Group, Anchor Law Firm, Harbor, Boulder, Bedrock, Royal, Stonepoint, Rockwell, Canyon, Summit, Great Lakes, Heartland, Whitestone, Monarch, Option 1, and WyoLaw. SFS pays the domain bills for these websites.

### Jason Blust Controls the Façade Firms

129.    Jason Blust coordinates the web of Façade Firms and exercises extensive control over them. He also helped create several of the Façade Firms. For example, Jason Blust orchestrated the creation of WyoLaw. He advised Traci Mears, a figurehead attorney, on setting up bank accounts, Employer Identification Numbers and the firm's mailing address, among other decisions.

130.    In 2021, the North Carolina State Bar Disciplinary Hearing Commission held a hearing regarding the license of Daniel Rufty, an attorney at Carolina Legal Services, which is one of the Façade Firms. The Commission issued a finding of fact that Jason Blust "started or helped start various law firms . . . in multiple states with the goal

of convincing debtors struggling to pay their bills to hire one of the [Façade Firms] to negotiate reduced payoff amounts with the debtor's creditors."

131.    In its ruling, the Commission referred to various Façade Firms as the "Blust Law Firms."

132.    The Commission concluded that "[Jason] Blust was in charge of the operations of [Carolina Legal Services] and regularly told [Rufty] what to do."

133.    In addition to his role in the creation of numerous Façade Firms, Jason Blust plays a continuing role in the management and oversight of many of them.

134.    Jason Blust directly manages some of the Façade Firms' operations. For example, he stated in 2020 in a sworn affidavit that he began managing the operations of the Anchor Law Firm, PLLC in 2016, including managing Anchor Law's attorneys and Anchor Law's non-attorney support services, which consist primarily of SFS and Client Services Subsidiary employees. Blust stated in the affidavit that he was still managing the firms at the time of the affidavit.

135.    Jason Blust also holds official positions in some Façade Firms. For example, he is a Vice President at Pioneer Law Firm, P.C.

*Jason Blust Recruits Attorneys for Façade Firms*

136.    Jason Blust also recruits attorneys for several of the Façade Firms, including Bedrock, Boulder, Carolina, Canyon, Harbor, Heartland, Rockwell, and Royal.

137.    For example, he recruited an SFS employee, Lauren Montanile, to become a member or supervising attorney of multiple Façade Firms, including Bedrock, Boulder, Carolina, Canyon, Harbor, and Heartland. Montanile still works at SFS but also reports to Jason Blust pursuant to her position at certain Façade Firms.

138.    As SFS CEO, Ryan Sasson also exercises control over Montanile, an SFS employee. Montanile's business address on file with the New York Bar is one of SFS's addresses: 711 3rd Avenue, 6th Floor, New York, New York 10017.

*Jason Blust Is a Conduit Between Façade Firms and SFS*

139.    Jason Blust also serves as a conduit between the Façade Firms, SFS, and the Client Services Subsidiaries, facilitating communications between the Façade Firms, on one hand, and SFS and its Client Services Subsidiaries, on the other hand.

140.    Jason Blust regularly emails and talks on the phone with employees of SFS and its Client Services Subsidiaries about consumers in SFS's debt-relief service.

141.    When employees of SFS or its Client Services Subsidiaries, including Montanile, are unable to resolve escalated consumer issues, they often consult with Jason Blust or send the issue to him for resolution.

142.    Jason Blust consults with employees of SFS, Client Services Subsidiaries, and Façade Firms regarding consumer complaints against Façade Firms, including complaints to state bars and the Better Business Bureau (BBB). Blust coordinates efforts by SFS, Client Services Subsidiaries, and Façade Firms to pressure consumers to take down negative reviews of Façade Firms to keep BBB ratings higher. The BBB ratings are used by SFS as a sales pitch, with SFS representatives suggesting that high BBB ratings are a reason that consumers should sign up for SFS's debt-relief service.

143.    Jason Blust controls when Façade Firm attorneys are allowed to work on client files. Façade Firm attorneys communicate issues to Jason Blust, such as when consumers are sued by their creditors. Blust then chooses whether to direct SFS to open a litigation file.

144.    Jason Blust also participates in meetings between SFS, Client Services Subsidiaries, and many of the Façade Firms, including Anchor Law Firm, PLLC, Bedrock Legal, LLC, Boulder Legal Group, LLC, Carolina Legal Services, LLC, Canyon Legal Group, LLC, Great Lakes Law Firm, LLC, Harbor Legal Group, LLC, Heartland Legal Group, LLC, Monarch Legal Group, LLC, and Royal Legal Group, LLC. At least one of the meetings between Blust and an attorney from Carolina Legal Services, LLC took place in New York State. Notably, Jason Blust participates regardless of whether he holds an official position with each firm.

*Jason Blust Provides Websites for, and Shares an Address with, Multiple Façade Firms*

145.    Jason Blust also registered domain names for Façade Firms, including Pioneer Law Firm, P.C., Harbor Legal Group, LLC, and Phoenix Legal Group, PLLC. Jason Blust controls the Façade Firm websites by selecting the vendor that creates the websites. Entities that Jason Blust controls or is the beneficiary of, including the Law Office of Jason Blust, LLC and Relief Defendants Blust Family Irrevocable Trust and Lit Def Strategies, use addresses in a co-working space at 211 W Wacker Drive, Chicago, IL 60606.

146.    Numerous Façade Firms use addresses in the same co-working space at 211 W. Wacker Dr. Chicago, IL 60606. At least ten Façade Firms have used addresses in that building:

- Anchor Law Firm, PLLC;

- Boulder Legal Group, LLC;

- Burnette Legal Group, LLC, a/k/a Monarch Legal Group;

- Credit Advocates Law Firm, LLC;

- Great Lakes Law Firm, LLC;

- Gustafson Legal, P.C.;

- Hallock & Associates;

- Harbor Legal Group;

- Henry Legal Group LLP;

- Hinds Law LLC d/b/a First America Law;

- Law Offices of Timothy F. Burnette;

- Option 1 Legal;

- Pioneer Law Firm, P.C.; and

- Wyolaw, LLC, d/b/a Summit Law Firm, LLC.

**Transfer of Assets to Individual Defendants and Relief Defendants**

147.    The Individual Defendants and Relief Defendants received funds obtained from consumers through the unlawful practices described in this Complaint.

*The Façade Firms and Client Services Subsidiaries*
*Benefit Jason Blust Financially*

148.    Individual Defendant Jason Blust benefits financially from the Façade Firms and the Client Services Subsidiaries. Specifically, Blust has control over bank accounts for certain Façade Firms which receive substantial funds from Client Services Subsidiaries, and Blust funnels money from the Façade Firms to his consulting companies.

149.    Jason Blust is the beneficial owner and signatory on bank accounts for
Pioneer Law Firm, P.C. As such, he has control over and entitlement to the funds in
those accounts. Bank account records show that in May and June 2018 alone, these
accounts received over $51,000 in payments from Pioneer Client Services, LLC, the
related Client Services Subsidiary.

150.    Jason Blust also uses consulting companies to direct consumer funds from
the Façade Firms to himself. Jason Blust directs and controls Relief Defendants Lit Def
Strategies, LLC and Relialit, LLC. He is the sole beneficial owner for bank accounts for
those two entities. As of June 2021, Jason Blust was the sole member and manager of
Relialit, LLC and the manager of Lit Def Strategies, LLC.

151.    Jason Blust and his various companies received significant payments from
Façade Firms. For example, the following Façade Firms regularly sent payments to Lit
Def Strategies:

- A. Florio & Associates, PLLC d/b/a Bedrock Legal Group f/k/a Raggio &
  Associates, PLLC;

- Anchor Law Firm, PLLC;

- Burnette Legal Group, LLC d/b/a Monarch Legal Group;

- Daniel Rufty Legal d/b/a Carolina Legal Services;

- Gardner Legal LLC d/b/a Option 1 Legal;

- Great Lakes Law Firm, LLC;

- Green Legal Services, LLC d/b/a Newport Legal Group;

- Harbor Legal Group, LLC;

- Henry Legal Group, LLP d/b/a Heartland Legal Group;

- Northstar Legal Group, LLC;

- The Sands Law Group d/b/a Whitestone Legal Group; and

- WyoLaw d/b/a Summit Law Firm.

From December 2019 to April 2021, payments from the foregoing Façade Firms to Lit Def Strategies totaled over $28 million.

152.    The following Façade Firms regularly sent payments to Relialit: The Sands Law Group, LLP; Burnette Legal Group, LLC; WyoLaw, LLC; Turnbull & Associates, LLC; Anchor Law Firm, PLLC; Raggio and Associates PLLC; Boulder Legal Group, LLC; JMS Industries. LLC; Colonial Law Group, LLC; Cornerstone Legal Group, LLC; Law Office of Amber Florio, PLLC; Crimson Legal Group, LLC; Frontier Consumer Law Group, LLC; Chabner Legal and Associates, LLP; Great Lakes Law Firm, LLC; Harbor Legal Group, LLC; Phoenix Legal Group, PLLC; Hodyno & Associates, PLLC; Donald Norris Associates PLLC; Royal Legal Group, LLC; Gardner Legal Group LLC; Lighthouse Tax & Financial, LLC; Pioneer Law Firm, P.C.; Henry Legal Group LLP; Daniel Rufty Legal, PLLC; and Meg Sohmer Wood, PLLC. From March 2019 and January 2020, these payments totaled over $358,000.

153.    Façade Firms also pay both Jason Blust personally and the Law Office of Jason Blust. For example, from January 2019 to May 2021, Monarch Legal Group paid Jason Blust $18,311 and the Law Office of Jason Blust $215,000.

154.    Similarly, Daniel Rufty, the local attorney for Façade Firm Carolina Legal Services referenced above in Paragraphs 130-132, testified in a 2021 North Carolina State Bar investigation that his firm paid consultants including Jason Blust and that Global sent payments from consumers' escrow accounts to Carolina Client Services, LLC (an SFS-owned entity).

155.    Rufty further testified that he although he owned 99% of Carolina Legal Services, he had rights to only 3% of its profits. The remaining 97% of profits were sent to Jason Blust and his associates, either directly or through his companies. Rufty testified that the payments were ostensibly for consulting work, data entry, and administrative services.

156.    The North Carolina State Bar ultimately found that consumer funds were used to pay Lit Def Strategies, Jason Blust, and SFS.

*Transfer to the ESOP Benefits Blumkin*

157.    Prior to the formation of Strategic ESOP and Strategic ESOT, Twist Financial, LLC (Blumkin's company) owned 17.99% of SFS.

158.    When SFS formed Strategic ESOP and Strategic ESOT, Twist (i.e., Blumkin) loaned Strategic ESOP approximately $43,000,000 at 3% interest rather than taking a lump sum payout for its ownership stake. Between December 2017 and March 2020, Blumkin received over $1,900,000 in interest payments and over $16,200,000 in principal repayments on the loan. Blumkin receives regular payments of interest and principal on this loan.

159.    Between December 2017 and March 2020, Strategic ESOP paid Twist over $16 million in principal and almost $2 million in interest.

*Transfer of Assets to Relief Defendants*

160.    Defendant Sasson and Relief Defendants Blumkin and Behar direct and control Relief Defendants Duke Enterprises, LLC, Twist Financial, LLC, and Blaise Investments, LLC, respectively.

161.    Defendants Sasson and Relief Defendants Blumkin and Behar are the sole members of Relief Defendants Duke Enterprises, LLC, Twist Financial LLC, and Blaise Investments, LLC, respectively.

162.    Between October 2016 and September 2017, SFS transferred almost $9,000,000 to Relief Defendants Twist Financial, LLC, Duke Enterprises, LLC, and Blaise Investments, LLC. Ryan Sasson was the signatory on the SFS account that transferred the funds. As such, Sasson had control over the flow of money into and out of the account.

163.    Between October 2016 and September 2017, SFS transferred over $3,200,000 to Blaise Investments, LLC.

164.    Between October 2016 and September 2017, SFS transferred over $3,400,000 to Duke Enterprises, LLC.

165.    Between October 2016 and September 2017, SFS transferred over $2,200,000 to Twist Financial, LLC.

166.    Donald J. Holmgren is the trustee of the Blust Family Irrevocable Trust. Holmgren resides at 7634 W Balmoral Ave, Chicago, IL. Jason Blust is the beneficiary of the Blust Family Irrevocable Trust.

167.    Between March 2020 to April 2021, Lit Def Strategies paid $36,000,000 to the Blust Family Irrevocable Trust.

168.    Defendant Jason Blust directs and controls Relief Defendants Lit Def Strategies, LLC and Relialit, LLC. Jason Blust is the sole beneficial owner on bank accounts for these entities at Associated Bank, at least.

169.    Between July 2020 and April 2021, the Blust Family Irrevocable Trust paid $8,300,000 to Relief Defendant Jaclyn Blust.

170.    Relief Defendants Albert Ian Behar, Duke Enterprises, LLC, Twist Financial, LLC, Blaise Investments, LLC, Lit Def Strategies, LLC, Relialit, LLC, the Blust Family Irrevocable Trust Through Donald J. Holmgren, Trustee, Jaclyn Blust, Strategic ESOP, and Strategic ESOT have received, directly or indirectly, funds and other assets from Defendants that are traceable to funds obtained from consumers through Defendants unlawful practices.

## Count 1
### By the Bureau and the States
### Charging Advance Fees in Violation of the TSR By Collecting Money Before the Consumer Has Made at Least One Payment Under a Settlement Plan
(Against all Defendants except Jason Blust)

171.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-170 of this Complaint.

172.    It is a violation of the TSR for any seller or telemarketer in connection with the sale of any debt-relief service to request or receive payment of any fee or consideration for any debt-relief service until and unless: (A) the seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt under a settlement agreement, debt-management plan, or other such valid contractual agreement executed by the customer; and (B) the customer has made at least one payment under that settlement agreement, debt-management plan, or other valid contractual agreement between the customer and the creditor or debt collector. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

173.    From at least January 2016 through the present, SFS, the Client Services Subsidiaries, and Sasson have engaged in ongoing conduct to request and receive fees

46

from consumers in connection with enrolled debts even though Defendants had not yet renegotiated, settled, reduced, or otherwise altered the terms of these debts under a settlement agreement, debt-management plan, or other such valid contractual agreement executed by the consumers. Indeed, as noted above, Defendants have frequently requested and received fees from consumers for whom they have not renegotiated, settled, or reduced any debt.

174.   In addition, as discussed above, from at least January 2016 and continuing through the present, Defendants have requested and received fees from consumers in connection with enrolled debts even though consumers had not yet made any payments under a settlement agreement, debt-management plan, or other valid contractual agreement between the consumers and the creditor or debt collector and relating to those enrolled debts.

175.   As discussed above, Individual Defendant Ryan Sasson participated in this practice of requesting and receiving fees (including but not limited to retainer fees, service fees, and administrative fees) before consumers made the first debt-relief payment to a creditor. Sasson also controlled SFS and its Client Services Subsidiaries and had authority to control the manner and timing of their requests for and receipt of fees and SFS's use of telemarketing. Sasson either knew about or was recklessly indifferent to the fact that SFS was selling debt-relief services by phone, including through interstate calls, and the manner and timing of SFS's and its Client Services Subsidiaries' requests for and receipt of fees.

176.   Defendants' practice of requesting or receiving payment of fees (including but not limited to service fees, administrative fees, and retainer fees) from consumers

under the circumstances described in Paragraphs 87-95 is an abusive act or practice in telemarketing that violates the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

177.   Individual Defendant Ryan Sasson controls SFS and its Client Services Subsidiaries and has authority to control practices regarding telemarketing and fees. Sasson also knows, or is recklessly indifferent to, the fact that SFS and its Client Services Subsidiaries sell debt-relief services by phone, including through interstate calls and that they request or receive fees from consumers before consumers made the first debt-relief payment to a creditor. Thus, Sasson is individually liable for these violations of the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

### Count 2
*By the Bureau and the States*
*Charging Advance Fees in Violation of the TSR by Collecting Fees After Settling Some but not all of a Consumer's Debts When the Fees Are not Proportional to the Amount of Debt Actually Settled or Based on a Fixed Percentage of the Amount Saved*
*(Against all Defendants except Jason Blust)*

178.   Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-170 of this Complaint.

179.   To the extent a seller or telemarketer renegotiates, settles, reduces, or otherwise alters a consumer's enrolled debts individually over time, the TSR prohibits the seller or telemarketer from requesting or receiving any fee or consideration unless such fee or consideration: (1) bears the same proportional relationship to the total fee from renegotiating, settling, reducing, or altering the terms of the consumer's entire debt balance as the individual debt amount bears to the entire debt amount, with the individual debt amount and the entire debt amount being those owed at the time the debt was enrolled in the service; or (2) is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. 16 C.F.R. § 310.4(a)(5)(i)(C).

48

180.    From at least January 2016 through the present, SFS, its Client Services Subsidiaries, and Sasson have settled consumers' debts individually over time and after doing so, have requested or received fees that: (1) do not bear the same proportional relationship to the total fee as the individual debt amount bears to the entire debt amount at the time of enrollment; and (2) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

181.    As discussed above, Individual Defendant Ryan Sasson participated in settling consumers' debts individually over time and while doing so, requesting or receiving fees that: (1) do not bear the same proportional relationship to the total fee as the individual debt amount bears to the entire debt amount at the time of enrollment; and (2) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. Sasson also controls SFS and its Client Services Subsidiaries and has authority to control practices regarding telemarketing and fees.

182.    Sasson either knows, or is recklessly indifferent to, the fact that SFS and its Client Services Subsidiaries sell debt-relief services by phone, including through interstate calls, and that they request or receive fees that: (1) do not bear the same proportional relationship to the total fee as the individual debt amount bears to the entire debt amount at the time of enrollment; and (2) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

183.    Defendants' practice of requesting or receiving fees described in Paragraphs 87-95 constitutes an abusive act or practice in telemarketing that violates the TSR. 16 C.F.R. § 310.4(a)(5)(i)(C).

184.    Individual Defendant Ryan Sasson controls SFS and its Client Services Subsidiaries and has authority to control practices regarding telemarketing and fees.

49

Sasson also knows, or is recklessly indifferent to, the fact that SFS and its Client Services Subsidiaries sell debt-relief services by phone, including through interstate calls, and request or receive fees or consideration that: (1) do not bear the same proportional relationship to the total fee from renegotiating, settling, reducing, or altering the terms of the consumer's entire debt balance as the individual debt amount bears to the entire debt amount, with the individual debt amount and the entire debt amount being those owed at the time the debt was enrolled in the service; or (2) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. Thus, Sasson is individually liable for these violations of the TSR. 16 C.F.R. § 310.4(a)(5)(i)(C).

### Count 3
*By the Bureau and the States*
*Substantial Assistance in Violation of the TSR*
(Against SFS and Client Services Subsidiaries)

185.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-170 of this Complaint.

186.    The TSR prohibits any person from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that constitutes deceptive or abusive conduct under the TSR. 16 C.F.R. § 310.3(b).

187.    As explained above, the Façade Firms constitute "sellers" in connection with their provision of, or arranging for others to provide, debt-relief services. 16 C.F.R. § 310.2(o), (dd), (ff).

188.    As explained above, in the course of offering to provide or providing debt-relief services to consumers, the Façade Firms have engaged, and continue to engage in, abusive acts or practices in violation of the TSR. 16 C.F.R. § 310.4(a)(5).

189.    SFS and the Client Services Subsidiaries provided, and continue to provide, substantial assistance or support to the Façade Firms by, among other things: creating and controlling the Façade Firms; handling all (or almost all) of the negotiation work on behalf of the Façade Firms; handling all (or almost all) consumer interactions while holding themselves out as Façade Firms; interacting with RAM and Global on behalf of the Façade Firms; and participating in the day-to-day business operations of the Façade Firms.

190.    SFS and the Client Services Subsidiaries knew or consciously avoided knowing that the Façade Firms were requesting or receiving fees from consumers before consumers made the first debt-relief payment to a creditor; and knew or consciously avoided knowing that the Façade Firms were settling consumer debts one at a time and taking fees that: (1) do not bear the same proportional relationship to the total fee as the individual debt amount bears to the entire debt amount at the time of enrollment; and (2) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

191.    SFS and the Client Services Subsidiaries have violated, and continue to violate, the TSR's ban on assisting and facilitating others' violations of that rule. 16 C.F.R. § 310.3(b).

**Count 4**
*By the Bureau and the States*
*Substantial Assistance in Violation of the TSR*
(Against Individual Defendants Sasson and Blust)

192.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-170 of this Complaint.

193.    As explained above, SFS constitutes a "telemarketer" and SFS, the Client Services Subsidiaries, and the Façade Firms constitute "sellers" in connection with their provision of, or arranging for others to provide, debt-relief services. 16 C.F.R. § 310.2(o), (dd), (ff).

194.    In the course of offering to provide or providing debt-relief services to consumers, the Façade Firms, the Client Services Subsidiaries, and SFS (largely acting through the Façade Firms and its Client Services Subsidiaries) have engaged, and continue to engage in, abusive acts or practices in violation of the TSR. 16 C.F.R. § 310.4(a)(5).

195.    The Individual Defendants provided, and continue to provide, substantial assistance or support to SFS, the Façade Firms, and the Client Services Subsidiaries.

196.    Ryan Sasson oversees all employees at SFS. He participated in the creation of the Façade Firms and the Client Services Subsidiaries and exerts control over both. Sasson interacted with RAM and Global on behalf of SFS, the Façade Firms, and the Client Services Subsidiaries. He participates in the day-to-day business operations of SFS, the Façade Firms, and the Client Services Subsidiaries.

197.    Jason Blust is a vice president for one Façade Firm, a member of another, and was involved in the creation of yet another. He also registered the domains for two of the Façade Firms. Jason Blust recruited attorneys to the Façade Firms and managed

the operations of Anchor Law Firm, PLLC from 2016 until at least 2020. He participates in the day-to-day operations of the Façade Firms, in part through his consulting firms, Relief Defendants Relialit and Lit Def Strategies. Jason Blust facilitated communication between the Façade Firms and SFS.

198.    The Individual Defendants knew or consciously avoided knowing: 1) that SFS was selling debt-relief services by phone, including through interstate calls; 2) that following the phone sales, SFS, the Façade Firms, and the Client Services Subsidiaries were providing debt-relief services for consideration; 3) that SFS, the Façade Firms, and the Client Services Subsidiaries were requesting or receiving fees from consumers before consumers made the first debt-relief payment to a creditor; and 4) that SFS, the Façade Firms and the Client Services Subsidiaries were settling consumer debts one at a time and taking fees that: (a) do not bear the same proportional relationship to the total fee as the individual debt amount bears to the entire debt amount at the time of enrollment; and (b) are not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

199.    The Individual Defendants have violated, and continue to violate, the TSR's ban on assisting and facilitating others' violations of that rule. 16 C.F.R. § 310.3(b).

### Count 5
*By the People of the State of New York*
*Repeated Fraudulent Acts in Violation of Exec. Law § 63(12)*
(Against All Defendants)

200.    The NYAG incorporates by reference the allegations contained in Paragraphs 1-170 of the Complaint.

201.    New York Executive Law § 63(12) empowers the Attorney General to seek restitution, damages and injunctive relief when any person or business entity has engaged in repeated fraudulent or illegal acts or otherwise demonstrates persistent fraud or illegality in the carrying on, conducting, or transaction of business. Statutory fraud under Executive Law § 63(12) is broader than common law fraud and includes any acts that have a tendency to deceive.

202.    Defendants have engaged in repeated fraudulent acts or otherwise demonstrated persistent fraud in the carrying on, conducting, or transaction of their debt relief business.

203.    The Individual Defendants participated in, had the ability to control, were aware of, or should have been aware of, the fraudulent acts of SFS and the Client Services Subsidiaries.

### Count 6
*By the People of the State of New York*
*Engaging in Deceptive Acts or Practices in Violation of GBL § 349*
(Against All Defendants)

204.    The NYAG incorporates by reference the allegations contained in Paragraphs 1-170 of this Complaint.

205.    New York General Business Law § 349 provides that "[d]eceptive acts or practices in the conduct of any business . . . in this state are hereby declared unlawful."

206.   In numerous instances, Defendants have violated GBL § 349 by engaging in deceptive acts or practices in connection with conducting their debt relief business.

207.   The Individual Defendants participated in, had the ability to control, were aware of, or should have been aware of, the deceptive acts and practices of SFS and the Client Services Subsidiaries.

## Count 7
*By the Bureau and the States*
*Funds and Assets Obtained Through Unlawful Practices Held in Constructive Trust*
(Relief Defendants)

208.   Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-170 of the Complaint.

209.   Relief Defendants have received, directly or indirectly, funds or other assets from Defendants that are traceable to, or commingled with, funds obtained from consumers through the unlawful practices described in this Complaint.

210.   Relief Defendants are not bona fide purchasers with legal or equitable title or other legitimate claim to the funds or other assets received from Defendants.

211.   Relief Defendants would be unjustly enriched if not required to disgorge funds or the value of the benefits received as a result of Defendants' unlawful acts or practices.

212.   The Relief Defendants hold funds and assets in constructive trust for the benefit of affected consumers.

## Count 8
*By the State of Wisconsin*
*Operating as Adjustment Service Company in Wisconsin Without License*
(Great Lakes Client Services, LLC, StratFS, LLC, Strategic Client Support, LLC, Strategic CS, LLC, Strategic FS Buffalo, LLC, Strategic NYC, LLC, Strategic Consulting, LLC, Strategic Family, Inc., Ryan Sasson and Jason Blust)

213.    The State of Wisconsin incorporates by reference the allegations contained in Paragraphs 1-170 of this Complaint.

214.    Wisconsin Stat. § 218.02(1)(a) defines "adjustment service company," in relevant part, as a "corporation, limited liability company, association, partnership or individual engaged as principal in the business of prorating the income of a debtor to the debtor's creditor or creditors . . . in return for which the principal receives a service charge or other consideration."

215.    Defendants Great Lakes Client Services, LLC, StratFS, LLC, Strategic Client Support, LLC, Strategic CS, LLC, Strategic FS Buffalo, LLC, Strategic NYC, LLC, Strategic Consulting, LLC, Strategic Family, Inc., Ryan Sasson and Jason Blust are each "adjustment service companies" within the scope of Wis. Stat. § 218.02(1)(a).

216.    Wis. Stat. § 218.02(2)(a)1. requires every adjustment service company to "apply to the division [of banking] for a license to engage in such business."

217.    None of Defendants has ever applied for an adjustment service company license as required by Wis. Stat. § 218.02(2)(a)1.

### Count 9
*By the State of Wisconsin*
*Violations of Wisconsin Adjustment Service Company Rules*
(Great Lakes Client Services, LLC, StratFS, LLC, Strategic Client Support, LLC, Strategic CS, LLC, Strategic FS Buffalo, LLC, Strategic NYC, LLC, Strategic Consulting, LLC, Strategic Family, Inc., Ryan Sasson, and Jason Blust)

218.    The State of Wisconsin incorporates by reference the allegations contained in Paragraphs 1-170 of this Complaint.

219.    Wisconsin Stat. § 218.02(7) provides that "It shall be the duty of the division [of banking] and the division shall have the power, jurisdiction and authority . . . [t]o issue general or special orders in execution of or supplementary to this section,

but not in conflict therewith, to protect debtors from oppressive or deceptive practices of licensees." Subsection (7)(d) further authorizes the division "[t]o determine and fix by general order the maximum fees or charges that such companies may make."

220.    The division has promulgated Wis. Admin. Code § DFI-Bkg chapter 73 pursuant to the preceding legislative authorizations.

221.    Defendants Great Lakes Client Services, LLC, StratFS, LLC, Strategic Client Support, LLC, Strategic CS, LLC, Strategic FS Buffalo, LLC, Strategic NYC, LLC, Strategic Consulting, LLC, Strategic Family, Inc., Ryan Sasson and Jason Blust have violated Wis. Admin. Code § DFI-Bkg 73 by: (a) charging fees far in excess of what is permitted under the rule, and (b) charging fees before any of the debtors' funds are remitted to the debtors' creditors as part of settlement.

<b>DEMAND FOR RELIEF</b>

Plaintiffs request that the Court:

   a. Award the Plaintiffs such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, including but not limited to a temporary restraining order and preliminary injunction on taking advance fees prior to the settlement of a consumer debt, an order freezing assets, directing the preservation of records, and allowing expedited discovery and financial reporting, and appointment of a temporary receiver;

   b. Permanently enjoin Defendants from committing future violations of the Telemarketing Act, 15 U.S.C. §§ 6102(c), 6105(d); the TSR, 16 C.F.R. pt. 310; and the CFPA, 12 U.S.C. § 5536(a), and any other provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14), as well as New

57

York General Business Law Articles 22-A and 28-B, and New York Executive
Law § 63(12);

c.  Permanently enjoin Defendants from the advertisement, marketing,
    promotion, offering for sale, or selling of any consumer financial product or
    service, including but not limited to any debt-relief service, and prohibit SFS,
    the Façade Firms, the Client Services Subsidiaries, and the Individual
    Defendants from having an ownership stake in any company that provides a
    debt-relief service;

d.  Award damages and other monetary relief against Defendants and Relief
    Defendants as the Court finds necessary to redress consumer injury resulting
    from Defendants' violations of the TSR, New York state law, and Wisconsin
    state law, including but not limited to rescission or reformation of contracts,
    refund of moneys paid, restitution, disgorgement or compensation for unjust
    enrichment, payment of damages, civil penalties pursuant to New York
    General Business Law § 350-d, and prejudgment interest;

e.  Award the Bureau and the States civil money penalties;

f.  Order Defendants to pay Plaintiffs' costs incurred in connection with
    prosecuting this action; and

g.  Award additional relief as the Court may determine to be just and proper.

Dated: January 10, 2024

                              Respectfully submitted,

                              Attorneys for Plaintiff
                              Consumer Financial Protection Bureau

                              ERIC HALPERIN
                              Enforcement Director

RICHA SHYAM DASGUPTA
Deputy Enforcement Director

TIMOTHY M. BELSAN
Assistant Litigation Deputy

  /s/ Vanessa Buchko
Vanessa Buchko
E-mail: vanessa.buchko@cfpb.gov
Phone: 202-435-9593
Monika Moore
E-mail: monika.moore@cfpb.gov
Phone: 202-360-9505
Joseph Sanders
E-mail: joseph.sanders@cfpb.gov
Phone: 202-377-9846
1700 G Street, NW
Washington, DC 20552
Facsimile: (202) 435-7722

And


LETITIA JAMES
Attorney General of the State of New
York

  /s/ Christopher L. Boyd
Christopher L. Boyd
Assistant Attorney General
350 Main Street, Suite 300A
Buffalo, NY 14202
Phone: (716) 853-8457
Email: Christopher.Boyd@ny.ag.gov

*Attorney for State of New York*

PHILIP J. WEISER
Attorney General
State of Colorado

  /s/ Kevin J. Burns
Kevin J. Burns, CO Reg. No. 44527
*Pro hac vice application pending*
Senior Assistant Attorney General
Colorado Department of Law

Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 6th Floor
Denver, CO 80203
Phone: (720) 508-6110
Kevin.Burns@coag.gov

*Attorneys for Plaintiff State of
Colorado, ex rel. Philip J. Weiser,
Attorney General*

KATHLEEN JENNINGS
Attorney General State of Delaware

*/s/ Marion M. Quirk*
Marion M. Quirk (*pro hac vice,
pending*)
Director of Consumer Protection
Kevin D. Levitsky (*pro hac vice
forthcoming, if required*)
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8810
Marion.Quirk@delaware.gov
Kevin.Levitsky@delaware.gov
*Attorneys for State of Delaware*

*Attorneys for State of Delaware*

KWAME RAOUL
Attorney General
State of Illinois

By: */s/ Greg Grzeskiewicz*
Greg Grzeskiewicz, Chief, Consumer
Fraud Bureau
*Pro hac vice application forthcoming, if
required*
Daniel Edelstein, Supervising Attorney,

Consumer Fraud Bureau
*Pro hac vice application forthcoming, if
required*
Amanda E. Bacoyanis, Assistant
Attorney
General, Consumer Fraud Bureau
*Pro hac vice application forthcoming*
Matthew Davies, Assistant Attorney
General,
Consumer Fraud Bureau
*Pro hac vice application forthcoming, if
required*
Office of the Illinois Attorney General
100 W. Randolph Street, 12th Floor
Chicago, Illinois 60601
312-814-2218
Greg.Grzeskiewicz@ilag.gov
Daniel.Edelstein@ilag.gov
Amanda.Bacoyanis@ilag.gov
Matthew.Davies@ilag.gov

*Attorneys for the People of the State of
Illinois*


KEITH ELLISON
Attorney General of Minnesota

*/s/ Evan Romanoff*
Evan Romanoff
Assistant Attorney General
*Pro hac vice application pending*
445 Minnesota Street, Suite 1200
St. Paul, Minnesota 55101-2130
Telephone: (651) 728-4126
evan.romanoff@ag.state.mn.us

*Attorney for the State of Minnesota
By Its Attorney General, Keith Ellison*

61

JOSHUA H. STEIN
Attorney General of North Carolina

 /s/  M. Lynne Weaver
M. Lynne Weaver (*pro hac vice* pending)
Special Deputy Attorney General
N.C. State Bar No. 19397
114 W. Edenton Street
Raleigh, NC 27602
Telephone: (919) 716-6039
lweaver@ncdoj.gov

*Attorney for the State of North Carolina*

JOSHUA L. KAUL
Attorney General of Wisconsin

/s/ Lewis W. Beilin
Assistant Attorney General (*pro hac vice*
pending)
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-1221
beilinlw@doj.state.wi.us

*Attorney for State of Wisconsin*

Case 1:24-cv-00040-JLS-MJR    Document 1-1    Filed 01/10/24    Page 1 of 2

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

CONSUMER FINANCIAL PROTECTION BUREAU, ET AL.

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Vanessa Buchko, Monika Moore, Joseph Sanders, Consumer Financial Protection Bureau; 1700 G Street, NW; Washington, DC 20552; 202-435-9593

## DEFENDANTS

STRATFS, LLC (F/K/A STRATEGIC FINANCIAL SOLUTIONS, LLC), ET AL.

County of Residence of First Listed Defendant   Erie
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☒ 1  U.S. Government
Plaintiff

☐ 2  U.S. Government
Defendant

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original
Proceeding
☐ 2 Removed from
State Court
☐ 3 Remanded from
Appellate Court
☐ 4 Reinstated or
Reopened
☐ 5 Transferred from
another district
(specify)
☐ 6 Multidistrict
Litigation
☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):
15 U.S.C. §§ 6102(c), 6105(d); 16 C.F.R. pt. 310; 12 U.S.C. §§ 5536(a), 5564, 5565
Brief description of cause:
Requesting and Receiving Advance Fees and Other Unlawful Fees in violation of the Telemarketing Sales Rule

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):
JUDGE _____   DOCKET NUMBER _____

DATE
01/09/2024

SIGNATURE OF ATTORNEY OF RECORD
VANESSA BUCHKO
Digitally signed by VANESSA BUCHKO
Date: 2024.01.09 16:26:10 -05'00'

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

JS 44 Reverse (Rev. 12/07)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.      **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

    (b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

    (c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.      **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.      **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.      **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.      **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI.      **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**      Example:      U.S. Civil Statute: <u>47 USC 553</u><br>                                                     Brief Description: <u>Unauthorized reception of cable service</u>

VII.      **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.      **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.